**W. F. NEWTON et ux., Appellants,**

v.

**Frank Howe PASLAY, Appellee.**

No. 15354.

Court of Civil Appeals of Texas.

Dallas.

Nov. 22, 1957.

Earl R. Parker, Dallas, and Balford Morrison, Irving, for appellants.

Leslie Jackson, Dallas, for appellee.

DIXON, Chief Justice.

This is an appeal from a judgment denying the application of appellants, W. F. Newton and his wife Goldie Newton, to adopt their grandson, three and a half years old.

■ On October 6, 1956 appellee Frank Howe Paslay, father of the child, filed suit against appellants, asking custody of his son. The baby had lived in the home of appellants, his maternal grandparents, since

his birth. Appellants answered and filed a cross-action asking leave to adopt the child and asking also that his name be changed from Richard Glenn Paslay to Richard Glenn Newton. Ellen Lanell Newton Summers, the little boy's mother, joined by her husband Gerald Ed Summers, filed their plea in intervention asking that custody of the child be left with his maternal grandparents, but asking also, in the alternative, that if any change in custody be made then they, intervenors, be awarded custody.

After a hearing the trial court awarded temporary custody to Mr. and Mrs. Newton, the maternal grandparents; ordered appellee Frank Howe Paslay to pay $10 per week as child support; set out in detail the days, hours and occasions for the child to visit appellee in appellee's home on a gradually enlarging and expanding scale; and denied appellants' application to adopt their little grandson.

Only the grandparents, Mr. and Mrs. Newton, have appealed, and they have appealed only from that part of the judgment denying their application to adopt the child.

The child's parents, appellee Frank Howe Paslay and intervenor Ellen Lanell Newton (Summers) were married February 1, 1953, when she was sixteen years of age and he lacked four days of being seventeen years of age. They rented a one-room "apartment" but kept their marriage a secret for about two weeks before informing their parents. On July 2, 1953, they separated, the young bride returning to the home of her parents, Mr. and Mrs. Newton. On August 14, 1953 she was granted a divorce. At the time she was pregnant, but said nothing about her pregnancy in her divorce petition, and in the divorce judgment nothing was said about the expected child and no provisions were made in regard to its care and support. About six months after the divorce the baby was born. It is the subject of the present litigation.

In January 1956 Mr. and Mrs. Newton, the maternal grandparents, sued their daughter for custody of the baby, alleging that she was unfit to have his care and custody. At the time she was living with them in their home. Appellee, father of the child, was not made a party to the suit. He testified that while the suit was pending his former wife phoned him, told him that her parents were seeking custody and that she did not want them to have the child. Appellee says that he told her he would employ an attorney and fight the case for her. Two days later she again phoned him and told him the Newtons had "dropped" the case. Believing her, appellee took no further action in the matter. Later appellee learned that the suit had not been dismissed. Upon examining the records at the court he found that his former wife had signed a waiver and judgment had been entered awarding care and custody of his son to Mr. and Mrs. Newton. About a week later the instant suit was filed by appellee, asking that custody of the child be awarded to him.

Meantime both Frank Howe Paslay and Ellen Lanell Newton, the baby's parents, had remarried. Ellen Lanell Newton married Gerald Ed Summers, who is in the military service and is now stationed in Germany. While he is overseas, Ellen Lanell Newton Summers lives with her parents with her baby (two months old at time of the trial) by her second marriage. Frank Howe Paslay has established his own home, where he lives with his present wife and their baby who was less than a year old at time of the trial. Appellee's mother, who is employed, also lives with them.

■ Appellants present only one point on appeal. In it they assert that the trial court erred in denying them the right to adopt their grandson. It is their contention that the consent of appellee to the adoption is not necessary under Art. 46a, sec. 6, Vernon's Ann.Civ.St., because the undisputed testimony is that appellee, the child's father, for a period of two years has failed and refused to contribute substantially to his child's support commensurate with his financial ability.

It is undisputed that appellee has not contributed to the child's support. But the testimony must be carefully weighed in order to determine whether the facts bring the case within the provisions of Art. 46a, sec. 6, Vernon's Ann.Civ.St. At the time of the trial appellee had never seen his son.

It is evident that there is much ill feeling between the parties. Appellee testified that his father-in-law, who is high tempered, once threatened him with a knife. His mother and sister testified that soon after the baby's birth appellee sent them as his emissaries to the Newton home with gifts including money for the baby. His mother and sister were not allowed to come into the house. They stood on the front porch and talked to Mrs. Newton and Lanell, the baby's mother, through a locked screen door. They testified that they were told that neither they nor appellee would be allowed to see the baby, nor would any gifts or money be accepted from appellee's family. Appellee at the time of the trial had never seen his son.

Appellee testified that he tried to see the baby. Here is his testimony:

"Q. Who did you see when you went there? A. I went to the door and knocked and my former wife came to the door and she asked what I wanted and I told her I would like to see my baby boy. While I was talking to her her mother came to the door and told me if I didn't leave she was going to call Bill or Mr. Newton, or William. * * * And my former wife told me that I had better leave, because she knew how 'Daddy' was, her daddy was, and I told her I would still like to see my baby, but I didn't hesitate because he had threatened me before. * * * A. Mr. and Mrs. Newton and my former wife, Lanell, and the whole party of Lanells—I mean, Newtons, would not let me see my boy."

With reference to his willingness to help support the child, appellee testified:

"Q. I see. Well, now, have you or not stood ready and willing to help take care of the child? A. Yes, I have. * * *

"Q. What did you do in the way of wanting to take care of the child, if anything? A. I went over there to see if I could see my child and after our divorce with my former wife, we had a few dates with each other, and I have tried to talk her into letting me see the baby, and on one or two times I told her I would give her some money and help her out in any way I could, and she refused and denied all my privileges of seeing my boy.

"Q. I see. Okay. Were you employed at that time? A. Yes, sir.

"Q. You wanted to try to help or not? A. Yes, sir. * * *

"Q. What was it with respect to them saying they wouldn't accept, if they so said, any help from you regarding the child? A. They told me they would not accept anything from the Paslays. * * * A. There was one date right after the baby was born I offered to help through my mother and sister and I offered to help by going over to their house to see the baby, and I offered my help to my former wife.

"Q. That was financial help? A. Yes, sir; financially help and also to see the baby. * * *

"Q. I see, and the result was that they would accept it, or wouldn't accept it? A. I was refused and denied of all privileges of seeing my baby. * * * A. Approximately around March of 1955, I had a date with my former wife. She was with me and we was out parked and I told her that—could I see the baby and could I help financially to take care of the baby. She refused my right to see the baby and she refused any offering that I wanted to contribute. * * * A. She asked

me why I didn't help when the baby was born, and I told her, 'As you know yourself, you all wouldn't let me around the house or even offer any contributions at all', and I said, 'And if I had come over and gave that money, would you accept?' and she said, 'No.' * *.

"Q. Just this; you have stood willing to pay, have you not? A. Yes; I have, on numerous occasions. * *

"The Court: Let me ask you this question. If the custody should be placed with someone else, are you willing to contribute to the support of your child? A. Yes, sir; I am.

"The Court: How much? A. To limit it to what I can financially get by on. * * *

"The Court: Well, you are the father of the child; I am asking you. A. Well, right now, since the aircraft industry has cut back to forty hours only, I couldn't afford to pay over ten dollars a week.

"The Court: All right."

The Newtons and Lanell deny that appellee ever offered any financial support, but their testimony to some extent corroborates that of appellee. Mrs. Newton and Lanell admitted that appellee's mother and sister came to the Newton home bearing gifts which were not accepted. Lanell Newton Summers further testified as follows:

"The Court: Let me ask you a question or two here. Mr. Paslay says he wants to offer something to help, that he wanted to, and you all wouldn't take it. Were you all ever willing to take any money from him? A. Not under the circumstances. No.

"The Court: That is what I want to know. You would not have received any had he offered it? A. If it had been under different circumstances.

"The Court: I mean under the circumstances; I can't change that. That is an important question and I want an answer to it. Would you have accepted money if he had offered it to you? A. No."

Mrs. Newton testified that appellee had once said the baby was not his. (Appellee on the witness stand denied ever making any such statement.) Mrs. Newton further testified:

"Q. I see. You haven't been willing from the beginning for the baby to be in the home of Frank, have you? A. No; not after the way he acted. * *

"Q. In other words, you and Mr. Newton wanted to take care of the finances; you wanted, you and Mr. Newton, wanted to take care of the custody, and you wanted him out entirely and stay entirely away—that is right, isn't it? A. If we —

"Q. Yes. You wanted him to stay entirely away. A. After he denied the child, yes."

Mr. Newton testified that he had never heard appellee deny the paternity of his child. He further testified: "Q. And you wanted to have the sole charge and custody of it and didn't want to turn it over to him? A. I wanted to take care of the child."

The statement of facts is 287 pages long and contains conflicting testimony in which background, personal history and other matters are brought out in regard to the fitness of the parties to have care and custody of the baby. As we are concerned in this appeal only with the refusal of the trial court to allow appellants to adopt the child, we see no need to discuss the testimony pertaining only to the question of the temporary custody awarded to the Newtons, or the enlarging and expanding of visitation privileges allowed to appellee.

In our opinion there is ample evidence in the record to support the court's implied finding that appellee had not failed and refused to contribute to the support of his

son commensurate with his financial ability. Appellee testified that he wanted to see his child and offered to help support him. The Newtons, including Lanell, deny that appellee offered to help support his son. However they admit that they refused to let appellee see the child, did not want him ever to have anything to do with the child, and would not have accepted his offers of financial assistance if he had made them. Appellee in his testimony repeatedly offered to contribute to his son's support and it was he who said that he could and would contribute $10 per week, the exact amount set by the court in the child support order. Appellants and the baby's mother, having thus been the architects of the plan whereby appellee was excluded from any participation in his son's care and support, will not be allowed now to end his parental rights forever on the ground that he has failed and refused to contribute to the support of the child commensurate with his financial ability.

The judgment of the trial court is affirmed.